## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| SHANE MCGUIRE | : CIVIL ACTION |
|---|---|
| | : |
| | : |
| v. | : NO. 14-1531 |
| | : |
| CITY OF PITTSBURGH, *et al.* | : |

**KEARNEY, J.**                                                                                    **November 3, 2016**

## MEMORANDUM

Relying upon the Fourth Amendment, citizens place justified trust in our police officers' restraint in not applying excessive force during an arrest. We generally recognize our police officers by their uniform, badge or announced role. Today, we address the potential liability of an off-duty officer initially concealing his police role who allegedly chased and then beat up a teenager smashing pumpkins and ringing the doorbell at the officer's family home. After the alleged excessive force, the off-duty officer admitted his public service role when asking a neighbor to call a police station to pick up the apprehended young man. After discovery, there are several genuine issues of material fact regarding whether the off-duty officer acted under color of state law. While a jury must determine whether the off-duty officer acted under color of state law, we find no basis for supervisory liability upon the City of Pittsburgh as his employer who trained him on excessive force. We deny the officer's motion for summary judgment and grant the City's motion.

## I.      Facts in the light most favorable to Mr. McGuire.[1]

While walking through a residential neighborhood with his friends indiscriminately smashing pumpkins, sixteen-year-old Shane McGuire walked into the unlit porch of a house

unknown to him and smashed a pumpkin.[2] McGuire's friends stacked a pyramid of bricks by the front door.[3] McGuire and his friends crossed the street and hid as they saw a car driving toward them.[4]

Colby Neidig, an off-duty police officer for the Pittsburgh Bureau of Police, with his wife and 13-month-old son, arrived home after grocery shopping to see at least two smashed pumpkins on his property and a brick pyramid by his front door.[5]

After pulling into their garage, the Neidigs walked around to the front of their home.[6] Although the bricks concerned Officer Neidig, the pumpkins did not.[7] He remarked to his wife, "I really can't be mad about the pumpkins because I was a kid once."[8] After a brief discussion about the bricks, the couple walked back to the garage to take the groceries inside.[9]

Watching across the street, McGuire's friends urged him to ring the Neidigs' doorbell.[10] McGuire ran up to the house, pressed the doorbell a few times, but did not hear a response.[11] When he turned to run back, McGuire tripped over the pyramid of bricks.[12]

Back in his garage, Officer Neidig heard a loud noise coming from the front door followed by the sound of his wife's loud footsteps and yelling.[13] He testified his wife "sounded like she was in a panicked state."[14] He took a step back and saw a male running through his yard away from his front door area.[15] Officer Neidig—dressed in plainclothes and without his badge, firearm, or handcuffs—chased after McGuire.[16]

Officer Neidig testified he saw McGuire as a "potential burglar who tried to break into my home"[17] and he "wanted to get the guy I thought tried to break into my home."[18] "The thought come into mind that a guy just tried to break into my home and I wanted to catch him. I didn't want my family to worry everyday who that individual might have been."[19]

McGuire, now joined by some friends, continued running away.[20]   Officer Neidig yelled for them to stop and shouted an expletive.[21]   While stepping over the crest of a hill, McGuire slipped on mud, landing about halfway down the hill.[22]   McGuire looked up and saw Officer Neidig's silhouette at the top of the hill.[23]   While looking down, Officer Neidig said, "I should shoot your ass."[24]

McGuire got up and continued running down the hill and into the woods.[25]   While running in the woods, Officer Neidig asked McGuire where he is from.[26]   McGuire responded, "lower Munhall."[27]   Officer Neidig responded, "So you're one of those basketball thugs."[28]   Officer Neidig told McGuire to stop a couple more times, but McGuire continued running.[29]   Eventually, McGuire ran back onto a road, with Officer Neidig still pursuing him.[30]

McGuire continued running about 50 more yards on the road until he was "completely gassed."[31]   McGuire stopped, put his hands above his head to catch his breath, and said to Officer Neidig, "Hey, sorry, man.   Sorry about the pumpkins.   Don't hurt me, man."[32]   Officer Neidig, about 40 to 50 yards away, responded, "Yeah I won't hurt you."[33]

While McGuire stood straight up with his hands above his head, Officer Neidig jogged over to him, grabbed him by the chest, and tackled him to the asphalt.[34]   Officer Neidig straddled McGuire "like an MMA fighter" and punched McGuire in the nose three or four times.[35]   McGuire testified he never tried to punch back, but only tried to defend himself from the punches.[36]

After the first few punches, Officer Neidig stated, "You think you can out run a 39-year-old who works in Wilkinsburg?"[37]   Upon hearing this, McGuire realized he should not hit Officer Neidig because he is a police officer.[38]   Officer Neidig testified he said at some point

3

he said, "I deal with worse fuckers than you in Homewood."[39]

Officer Neidig then grabbed McGuire by the throat, choking him, and asked for his name.[40]   McGuire responded, "I can't say anything with your hands around my throat."[41]   As soon as Officer Neidig took off his hands, he struck McGuire with his head and continued punching him five or six more times.[42]

Officer Neidig then stood up, grabbed McGuire by the hood of his sweatshirt, and walked up the street with McGuire in hand.[43]   While walking, McGuire asked, "Are you a cop?"[44]   Officer Neidig responded, "What do you think?"[45]

Officer Neidig continued until he reached a house about 50 or 60 yards away.[46]   After Officer Neidig sat McGuire down on the stoop, he rang the doorbell, introduced himself as an off-duty police officer, and stated, "I need you to call 9-1-1.  I have a vandal in custody."[47]   McGuire again asked Officer Neidig if he is a police officer, and Officer Neidig responded, "What do you think?"[48]   McGuire stated he needed to call his father, but Officer Neidig told him to wait until the police arrived.[49]   McGuire's nose bled heavily.[50]

After waiting about 20 to 30 minutes, Officer Neidig went to the door and asked for the phone.[51]   Outside of McGuire's presence, Officer Neidig called 911 and identified himself as an off-duty police officer, hoping to get a quicker response.[52]   An ambulance arrived, and paramedics treated McGuire on the scene.[53]   A police patrol car arrived shortly afterwards.[54]

The Commonwealth charged McGuire with four crimes as a juvenile: 1) loitering and prowling at night, 2) criminal mischief, 3) harassment; and 4) criminal conspiracy.[55]   The Commonwealth withdrew the harassment charge, but the parties dispute whether the Commonwealth withdrew the remaining charges.

4

The City's Office of Municipal Investigation investigated Officer Neidig's conduct, but it did not complete its report or come to any firm conclusions.[56] The investigator claims she did not finish the report because McGuire did not cooperate, which is factually disputed.[57] The unfinished report, however, states: a) if Officer Neidig had been acting as a police officer, he had reasonable suspicion to detain McGuire; and b) if Officer Neidig had been acting as a private citizen, he did not have the right to arrest McGuire because he did not "personally observe" McGuire committing a crime.[58] The report did not make any express conclusions as to the propriety of Officer Neidig's conduct, but stated, "If PO Neidig did not have a legal right to detain Shane, it would be a violation of 16.1 Standards of Conduct; 3.1 Obedience to Orders and/or Laws."[59]

McGuire sued Officer Neidig, the City of Pittsburgh, and another police officer for claims under the United States Constitution and state law.[60] We granted Defendants' partial motion to dismiss in part, dismissing McGuire's state law claims for malicious prosecution and false arrest, and dismissing his § 1983 claims for failure to intervene, conspiracy, false arrest, and malicious prosecution.[61]

McGuire's remaining claims are state law claims for assault and battery and a § 1983 excessive force claim. The only claim remaining against the City is a § 1983 supervisory liability claim.

## II. Analysis

The City moved for summary judgment, and Officer Neidig moved for partial summary judgment on the § 1983 claim.[62]

5

## A. We deny Officer Neidig's motion for summary judgment on McGuire's § 1983 claim.

Officer Neidig argues he is not liable under § 1983 because McGuire failed to produce evidence he committed the alleged misconduct under color of law. McGuire counters Officer Neidig's conduct is consistent with that of a police officer.

Officer Neidig is not liable under § 1983 unless he committed the alleged misconduct "under color of state law."[63] For liability under the Constitution, his alleged misconduct must have involved "state action."[64] "The "under color of state law" analysis is equivalent to the "state action" analysis."[65] McGuire has the burden of proving Neidig acted under color of law.[66]

"It is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state."[67] Rather, an off-duty police officer like Officer Neidig must have committed the alleged misconduct "under pretense of law,"[68] and his conduct "must entail 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"[69] We must determine whether Officer Neidig "abused a power or position granted by the state"[70] such that his conduct "can be fairly attributed to the state itself."[71]

This inquiry is "fact-specific."[72] "[A] state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law," but "off-duty police officers who . . . purport to exercise official authority generally act under color of law."[73] This purported authority may be manifested in many ways: a) "flashing a badge";[74] b) "identifying oneself as a police officer";[75] c) "wearing a police uniform";[76] d) "intervening in a dispute involving others pursuant to a duty imposed by police department regulations";[77] e) ordering the plaintiff "repeatedly to stop";[78] f) seeking to arrest the

6

plaintiff;[79] and f) using a state-issued weapon;[80] g) "placing [the plaintiff] under arrest."[81] For example, our Court of Appeals held an off-duty security guard acted under color of state law because she wore a police uniform, ordered the plaintiff repeatedly to stop, and sought to arrest him.[82]

A private citizen is vested with state authority to make an arrest in certain circumstances. Under the common law, a "peace officer" could "arrest without a warrant for a misdemeanor or felony committed in his presence."[83] Consistent with the common law, the Pennsylvania Supreme Court recognized a "private citizen" has a "common law power to arrest for breaches of the peace committed in one's presence."[84] The Pennsylvania General Assembly likewise permits private citizens to use force to make "lawful" arrests.[85]

We must submit the determination of whether Officer Neidig acted under color of law to the jury to decide if he acted under color of law. In *Fate v. Harper*, Judge Schwab held a reasonable jury could conclude the defendant off-duty police officer acted under color of law where the officer—who had just been in a car accident with the plaintiff—blocked the plaintiff from driving away, ordered him to exit he car, demanded his license, registration and insurance information, brandished his city-issued fire-arm, and called on-duty officers.[86]

A reasonable jury could find Officer Neidig committed the alleged misconduct under the color of law. While chasing after McGuire, Officer Neidig ordered him to stop multiple times. Officer Neidig effected a de facto arrest on McGuire by tackling him to the ground and subduing him. While attacking McGuire, Officer Neidig made statements suggesting he is a police officer. According to McGuire, Officer Neidig stated, "You think you can out run a 39-year-old who works in Wilkinsburg?"[87] Officer Neidig admits at some point during or after the struggle

7

he "deal[s] with worse fuckers than you in Homewood."[88]   While these statements alone do not define Officer Neidig as a police officer, the totality of the circumstances permit the reasonable inference Officer Neidig committed the alleged misconduct while "clothed with the authority of state law."[89]

## B. We grant the City's motion for summary judgment on McGuire's supervisory liability claim under § 1983.

Having found a reasonable jury may conclude Officer Neidig acted under color of law and may have liability under §1983 as an alternative to assault and battery under state law, we analyze whether the City must proceed to trial under a theory of supervisory liability.   The City argues McGuire failed to prove it did not properly train, discipline, or supervise Officer Neidig. McGuire counters there are sufficient facts for a jury to reasonably conclude the City acted deliberately indifferent toward him for failing to: 1) implement an off-duty conduct policy; 2) conduct a complete investigation of his citizen's complaint against Officer Neidig; and 3) train its officers on off-duty conduct.[90]   We understand McGuire's arguments as three distinct potential theories of supervisory liability: 1) the City's failure to adopt an off-duty policy; 2) the City's custom or practice of not completing investigations of citizens' complaints regarding police off-duty misconduct committed under color of law; and 3) the City's failure to train its officers on off-duty use of force.   McGuire fails to demonstrate a claim for supervisory liability under § 1983.

In *Monell*, the United States Supreme Court held a city may be liable under § 1983 when it causes the constitutional violation at issue.[91]   To succeed on a *Monell* claim, McGuire must establish: "(1) [he] possessed a constitutional right of which [he] was deprived; (2) the municipality had a policy [or custom]; (3) the policy [or custom] 'amounted to deliberate

8

indifference' to [his] constitutional right; and (4) the policy [or custom] was the 'moving force behind the constitutional violation.'"[92]

Acts of a government employee "may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works" where: 1) "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy"; 2) "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself"; and 3) "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'"[93]

For example, as to the third theory, our Court of Appeals in *Natale* held "the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs."[94]  In *Natale*, the defendant correctional facility maintained a policy of screening incoming inmate' medical needs, but the screening had many failings.[95] The medical assistant recorded the inmates' medical needs, but did not pass on the information.[96]  Staff could not provide medication to an inmate without first obtaining an order from a doctor.[97]  The policy did not require a doctor to see an inmate within the first 72 hours, and the policy did not charge anyone with the responsibility of determining whether an inmate should be seen by a doctor earlier in the first 72-hour period.[98]  As a result, the policy did not ensure an inmate with a need for medication for a serious medical condition would receive medication during the first 72 hours of

9

his incarceration.[99] The court concluded the facility's failure to establish a policy demonstrated the facility "disregarded a known or obvious" risk the inmates' medical conditions may require medication within the first 72-hours of their incarceration.[100]

McGuire does not identify which theory he relies on for his supervisory liability claim. McGuire does not identify evidence of a generally applicable statement of policy. Nor does McGuire identify evidence a policymaker violated federal law. McGuire does argue, however, there is evidence the City failed to act affirmatively by not creating an off-duty policy and by not conducting complete investigations into potential misconduct by off-duty police officers. We address these theories below.

### *The City's alleged failure to maintain an off-duty policy regarding the use of force.*

McGuire's first theory of supervisory liability fails. For the City's failure to maintain an off-duty policy to be actionable, McGuire must demonstrate the need to maintain a policy regarding police off-duty conduct "is so obvious, and the inadequacy of existing practice so likely to result in" excessive force, "that the policymaker can reasonably be said to have been deliberately indifferent to the need."[101] McGuire fails to show the need for such a policy is obvious.

The City admits it does not have any policy or general orders in effect regarding off-duty conduct.[102] The City does, however, have a policy regarding the use of force.[103] Officer Neidig underwent training on the use of force.[104] Officer Neidig testified his training applied to his conduct with McGuire.[105] This training decreases the probability the City's failure to maintain an off-duty policy would "likely" result in off-duty officers committing excessive force. A reasonable jury could not conclude the need for an off-duty policy is obvious given Officer

10

Neidig's training on the use of force.

To show the need for such a policy, McGuire proffered an expert report by R. Paul McCauley, Ph.D., FACFE, an Emeritus Professor of Criminology at the Indiana University of Pennsylvania.[106] Dr. McCauley bases his opinions on "best practices" of law enforcement management, organization, administration, and operation.[107] Dr. McCauley describes the International Association of Chiefs of Police's policy regarding police off-duty conduct.[108] This cited model policy prohibits off-duty officers from enforcing minor violations such as harassment and disorderly conduct.[109] Nor may off-duty officers make an arrest if the officer is "personally involved in the incident underlying the arrest."[110] The model policy requires the officer report suspected or observed criminal activities to on-duty authorities.[111] Dr. McCauley opines this model policy is "readily available" to the City.[112] He concluded the City's failure "to guide and direct police off-duty conduct was a substantial factor causing the harm suffered by Shane McGuire."[113] Dr. McCauley's opinion makes intuitive sense, as the model policy would have prohibited Officer Neidig from pursuing and arresting McGuire, and instead would have required him to contact on-duty authorities.

There is also evidence the City understood the need for a policy governing off-duty conduct. The table of contents to the Pittsburgh Bureau of Police's policies contains a section entitled "Off Duty Conduct: Powers of Arrests."[114] Even so, the City does not maintain a policy regarding off-duty conduct.

McGuire fails to demonstrate the need for a policy regarding off-duty conduct is obvious or the City's existing practice of maintaining no off-duty conduct policy is likely to result in off-duty officers committing excessive force. The City's failure to adopt a policy regarding off-duty

11

conduct created a risk off-duty officers would intervene in criminal matters. Although an off-duty officer without such a policy might intervene in situations where "best practices" dictate he should not, the mere fact an off-duty officer intervenes does not necessarily mean he will likely commit excessive force.

### *The City's alleged failure to complete investigating a McGuire's complaint against Officer Neidig.*

McGuire argues the City's failure to complete the investigation into his complaint against Officer Neidig is evidence of deliberate indifference. We understand this argument as a theory of supervisory liability based on the City's custom of failing to investigate its officers' off-duty misconduct committed under color of law.

McGuire fails to demonstrate the City had a custom of failing to investigate off-duty conduct. A custom is a course of conduct not authorized by law, but "virtually constitutes law" because practices of state officials are "permanent and well-settled.[115] McGuire only cites his complaint regarding off-duty conduct the City did not fully investigate: the complaint against Officer Neidig. The other citizens' complaints against Officer Neidig do not concern off-duty conduct, and the Office of Municipal Investigation completed all of these reports.[116] McGuire fails to demonstrate the City had a custom—*i.e.* "permanent and well-settled" course of conduct[117]—of failing to complete investigations into off-duty conduct.

McGuire argues the City's failure to have a written policy regarding off-duty conduct means the City "cannot catalogue and readily retrieve" complaints of off-duty conduct by order or policy number.[118] The City's system of cataloguing citizens' complaints, however, has no bearing on the existence of a custom.

12

*The City's alleged failure to train on off-duty use of force.*

McGuire also fails to adduce genuine issues of material fact on whether the City failed to train its officers on off-duty use of force. "Establishing municipal liability on a failure to train claim under § 1983 is difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries."[119] McGuire also "must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." [120] McGuire must identify "the specific training the [City] should have offered."[121] "Mere proof that an injury could have been avoided if the municipal officer or employee 'had better or more training is not enough to show municipal liability' under a 'failure to train' *Monell* claim."[122]

Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train."[123] "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[124] "A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'"[125]

Absent a pattern of violations, a failure to train claim may proceed where (1) a constitutional violation is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools or skills to handle recurrent situations," and (2) the

13

likelihood of recurring violations justifies "a finding that the policymakers' decision not to train an officer reflected deliberate indifference" to the violation of a constitutional right.[126]

McGuire fails to demonstrate a pattern of excessive force violations by untrained off-duty police officers. He does not cite instances of excessive force violations by other untrained off-duty police officers.

McGuire also fails to demonstrate his injury is a "highly predictable consequence" of the City's failure to equip its police officers with specific tools or skills to handle "recurrent situations."[127] In support of his failure to train argument, McGuire proffered the expert opinion of Dr. McCauley, stating City officers "are not reasonably trained on off-duty conduct."[128] Dr. McCauley's opinion does not address the applicable standard: whether Officer Neidig's use of force is a highly predictable consequence of the City's failure to train on off-duty use of force. Officer Neidig underwent training on excessive force, and such training negates the argument the City failed to equip its police officers with skills needed to handle the use of force while off duty. McGuire fails to demonstrate how Officer Neidig's use of excessive force is a highly predictable consequence of the City's failure to train its officers on off-duty use of force.

## C. Conclusion

In the accompanying Order, we deny Officer Neidig's motion for summary judgment as there are genuine issues of material fact from which a jury could find he used excessive force under color of law. We grant the City's motion for summary judgment as McGuire fails to demonstrate § 1983 supervisory liability arising from an unconstitutional custom or the City's failure to train its officers.

[1] "[W]e view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *In re Net Pay Sols., Inc.*, 822 F.3d 144, 158 (3d Cir. 2016).

[2] ECF Doc. No. 53-4, at pp. 7–9.

[3] *Id.* at p. 9.

[4] *Id.*

[5] *Id.*

[6] *Id.* at p. 6.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] ECF Doc. No. 53-4, at p. 9.

[11] *Id.*

[12] *Id.*

[13] ECF Doc. No. 53-3 at pp. 6–7.

[14] *Id.* at p. 7.

[15] *Id.*

[16] *Id.* at pp. 7, 30; ECF Doc. No. 53-4, at p. 11.

[17] ECF Doc. No. 53-3, at p. 23.

[18] *Id.* at p. 9.

[19] *Id.* at p. 10.

[20] ECF Doc. No. 53-4, at p. 11.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at p. 12.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.* at p. 13.

[34] *Id.* at pp. 13, 15.

[35] *Id.* at pp. 13–14.

[36] *Id.* at p. 14.

[37] *Id.*

[38] *Id.*

[39] ECF Doc. No. 53-3, at p. 23.

[40] ECF Doc. No. 53-4, at p. 15.

[41] *Id.*

[42] *Id.*

[43] *Id.* at p. 16.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at pp. 16–17.

[48] *Id.* at p. 17.

[49] *Id.*

[50] *Id.* at p. 16.

[51] *Id.* at pp. 17, 19.

[52] ECF Doc. 53-3, at p. 20.

[53] ECF Doc. No. 53-4, at p. 18.

[54] *Id.*

[55] ECF Doc. No. 53-6, at p. 1.

[56] ECF Doc. No. 54-10, at pp. 25–26; ECF Doc. No. 54-8, at p. 4.

[57] ECF Doc. No. 54-8, at p. 4–5 (stating McGuire did not cooperate after the investigator sought to interview him); ECF Doc. No. 54-5, at p. 2 (indicating McGuire submitted a written statement).

[58] ECF Doc. No. 54-5, at pp. 7–8.

[59] *Id.* at p. 7.

[60] ECF Doc. No. 1.

[61] ECF Doc. No. 37, at p. 12.

[62] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[63] *Sprauve v. W. Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)).

[64] *Id.* (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

[65] *Id.* (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)).

[66] *Groman*, 47 F.3d at 638 (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

[67] *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995).

[68] *Id.* at 1151 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)) (quotation marks omitted).

[69] *Id.* at 1150 (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)) (brackets omitted).

[70] *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997).

[71] *Groman*, 47 F.3d at 638.

[72] *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

[73] *Bonenberger*, 132 F.3d at 24.

[74] *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994).

[75] *Id.*

[76] *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999).

[77] *Barna*, 42 F.3d at 816.

[78] *Abraham*, 183 F.3d at 287.

[79] *Id.*

[80] *Barna*, 42 F.3d at 818.

[81] *Id.* at 816.

[82] *Abraham*, 183 F.3d at 287.

[83] *United States v. Watson*, 423 U.S. 411, 418 (1976).

[84] *Kopko v. Miller*, 892 A.2d 766, 775 (Pa. 2006); *see also id.* (quoting *Com. v. Corley*, 462 A.2d 1374, 1379 (Pa. Super. 1983) ("[W]e hold that a citizen's arrest can be made for a breach of the peace that is personally observed by the arrestor.").

[85] *See* 18 Pa. C.S.A. § 508(b)(1) ("A private person who makes, or assists another private person in making a lawful arrest is justified in the use of any force which he would be justified in using if he were summoned or directed by a peace officer to make such arrest, except that he is justified in the use of deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or another.").

[86] *Fate v. Harper*, No. 12-459, 2013 WL 440967, at *1, 3 (W.D. Pa. Feb. 5, 2013).

[87] ECF Doc. No. 53-4, at p. 14.

[88] ECF Doc. No. 53-3, at p. 23.

[89] *Mark*, 51 F.3d at 1150 (quoting *Classic*, 313 U.S. at 326) (brackets omitted).

[90] ECF Doc. No. 54, at p. 17.

[91] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[92] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton*, 489 U.S. at 389–91) (brackets omitted).

[93] *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 417–18 (1997)).

19

[94] *Id.* at 585.

[95] *Id.* at 584.

[96] *Id.*

[97] *Id.*

[98] *Id.* at 584–85.

[99] *Id.* at 585.

[100] *Id.*

[101] *Id.* at 584 (quoting *Bryan Cty.*, 520 U.S. at 417–18).

[102] ECF Doc. 54-3, at pp. 1–3.

[103] ECF Doc. No. 54-2, at p. 1.

[104] ECF Doc. No. 53-3, at p. 17.

[105] *Id.*

[106] ECF Doc. No. 53-7.

[107] *Id.* at p. 3.

[108] *Id.* at p. 9.

[109] *Id.*

[110] *Id.* at p. 9–10.

[111] *Id.* at p. 9.

[112] *Id.* at p. 10.

[113] *Id.*

[114] ECF Doc. No. 54-2, at p. 5.

[115] *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

[116] ECF Doc. No. 54-6; ECF Doc. No. 54-7.

[117] *Mulholland*, 706 F.3d at 237 (quoting *Beck*, 89 F.3d at 971).

[118] ECF Doc. No. 54, at p. 16.

[119] *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[120] *Id.* (citing *Colburn*, 946 F.2d at 1030).

[121] *Id.*

[122] *White v. Brommer*, 747 F. Supp. 2d 447, 463 n.42 (E.D. Pa. 2010) (quoting *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007)); *see also City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

[123] *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

[124] *Id.* (quoting *Connick*, 563 U.S. at 62).

[125] *Thomas*, 749 F.3d at 223 (quoting *Bryan Cnty.*, 520 U.S. at 407).

[126] *White*, 747 F. Supp. 2d at 463 (quoting *Kline*, 255 F. App'x at 629) (brackets and quotation marks omitted).

[127] *Id.* (quoting *Kline*, 255 F. App'x at 629).

[128] ECF Doc. No. 53-7, at p. 18.